UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PATRICK HORSMAN and
HORSMAN HOLDINGS LLC,

     Plaintiffs,

v.                           Case No.:  2:23-cv-1205-SPC-KCD

MICHAEL COONEY, BLUE SAND
CAPITAL, LLC and BLUE SAND
SECURITIES, LLC,

     Defendants.

_____/

## OPINION AND ORDER

Before the Court is Defendants Michael Cooney, Blue Sand Capital, LLC, and Blue Sand Securities, LLC's Motion to Dismiss the Third Amended Complaint. (Doc. 81). Plaintiffs Patrick Horsman and Horsman Holdings LLC responded in opposition. (Doc. 85). Thus, the motion is ripe for review.

## BACKGROUND

This action arises out of an acrimonious business divorce. In August 2006, Patrick Horsman ("Horsman") and Defendant Michael Cooney ("Cooney" or "Defendant Cooney") co-founded Blue Sand Securities LLC ("Blue Sand Securities"), a placement agent and broker dealer that raises money for alternative investment funds, hedge funds, private equity, real estate, and venture capital investments. Contemporaneously, they executed an operating

agreement. Several years later, in 2015, they added Nelson Cooney (Defendant Cooney's brother) as a member of Blue Sand Securities.[1]

Fast-forward to July 2020, the three members agreed to change the ownership structure of Blue Sand Securities. Rather than having three individual owners, Blue Sand Securities would be owned solely by a single entity: Blue Sand Capital LLC ("Blue Sand Capital" or "the Company"). In turn, Defendant Cooney, Nelson Cooney, and Horsman Holdings LLC ("Holdings") owned Blue Sand Capital. Defendant Cooney held sixty percent of the membership interest, Nelson Cooney held ten percent, and Holdings owned the remaining thirty percent. Horsman and the Cooney brothers were managers of Blue Sand Capital.

To accomplish this restructuring, the parties amended the Blue Sand Securities Operating Agreement in July 2020 to reflect Blue Sand Capital as its sole member. Blue Sand Capital needed its own operating agreement. So, on that same day, the three members executed the Blue Sand Capital Operating Agreement ("Operating Agreement"). Horsman signed the Operating Agreement on behalf of Holdings and separately in his individual capacity as manager.

---

[1] Nelson Cooney was originally a defendant, but he was voluntarily dismissed. (Doc. 46).

A few months later, the relationship began to sour.  On October 2, 2020, a former investor sued Horsman (among others) in Arizona (the basis of which is not apparent from the pleadings).  This same former investor also went to a newspaper outlet, which published an article repeating the allegations from the lawsuit.  Although the Cooneys acknowledged the lawsuit was frivolous, they grew concerned that the poor publicity would tarnish Blue Sand Capital's reputation.  And Horsman wished to devote his time to defending the litigation.  So on October 8, 2020, he resigned as a registered representative of Blue Sand Securities and as a manager of Blue Sand Capital.  (Doc. 82 at 5).

Horsman's resignation apparently did not alleviate the Cooneys' concerns.  And after some back and forth between the parties, they could not come to a resolution.  The Cooneys offered various proposals to buy Holdings out of its membership in Blue Sand Capital or hold its interest in escrow (until the pending litigation ended), but Holdings found none appealing.  So the Cooneys implemented their own plan.

In March 2021, Cooney amended the Blue Sand Capital Operating Agreement to include a provision permitting the Company to repurchase a member's membership interests—section 10.6.  Then in August, he repurchased Holdings' membership interest for a mere $15,000—the amount of Holdings' investment in the Company.  But Cooney amended the Operating

Agreement and repurchased Holdings' membership interest without a formal vote or meeting, so Plaintiffs participated in neither decision.

Cooney took one other major course of action. By written consent, he and his brother dissolved Blue Sand Capital, effective March 1, 2022. (Doc. 82 at 24–26). Defendant Cooney then filed a Certificate of Cancellation with the Delaware Secretary of State (Doc. 82 at 31), which the Secretary of State filed on March 23, 2022 (Doc. 74 ¶ 173; Doc. 82 at 30). Thus, Blue Sand Capital no longer exists.

The crux of this case is the repurchasing of Holdings' thirty percent membership interest. Plaintiffs argue that, by doing so, Defendant Cooney breached various provisions of the Operating Agreement. In any event, their primary concern is that Cooney had no authority to amend the Operating Agreement and that the repurchasing of Holdings' membership interest violated it. They also argue Defendant Cooney breached the Amended Blue Sand Securities Operating Agreement, the implied covenant of good faith and fair dealing, an oral contract prohibiting involuntary redemptions of membership interests, and his fiduciary duty of loyalty and care; tortiously interfered with a contractual and business relationship; and was unjustly enriched. Plaintiffs also seek indemnification and advancement from Blue Sand Securities and a declaratory judgment against all three Defendants. (Doc. 74).

Also pertinent is Plaintiffs' prayer for relief. Among other relief, they ask the Court to declare that Horsman retains all managerial rights and authority in Blue Sand Capital and that Holdings retains its full thirty percent membership interest in the Company. They also seek a monetary judgment against Defendant Cooney for each claim brought against him.

Defendants raise several arguments for dismissal. They argue Horsman lacks standing to bring certain claims because he was not a member or an "Economic Interest Owner"[2] of Blue Sand Capital. They then argue that Blue Sand Capital is an indispensable party that cannot be sued (because it no longer exists), so the entire case must be dismissed. They also believe Plaintiffs failed to properly serve Blue Sand Capital, and that the Operating Agreement's exculpatory clause bars Plaintiffs' claims. Finally, they argue Plaintiffs fail to state a claim. (Doc. 81).

## ANALYSIS

Before delving into the merits, the Court addresses a few preliminary matters. First is the Court's subject-matter jurisdiction. Plaintiffs brought this case based on diversity of citizenship. The Court found the parties diverse in its last Order. (Doc. 47 at 4–5). That said, it was unknown then that Blue

---

[2] Under the Operating Agreement, an "Economic Interest Owner" is "the owner of an Economic Interest who is either not a Member or is a holder of Profits Interest Shares." (Doc. 74 at 82). In turn, an "Economic Interest" means a member's economic interest in the Company's profits, losses, and distributions but does not include and management or voting rights. (*Id.*).

Sand Capital no longer exists. Even so, this makes no jurisdictional difference. Because Blue Sand Capital no longer exists, for purposes of this lawsuit, it lacks citizenship. *See Diamond Scaffold Servs., LLC v. Salt Sols., LLC*, No. CV 18-0470-WS-B, 2019 WL 2023730, at *2–3 (S.D. Ala. May 8, 2019) (because a company did not exist under relevant state law, "[i]t thus lacks any citizenship"). In other words, the cancelled entity is treated as a Doe defendant, and its citizenship is ignored for diversity purposes. *Id.* at *3. The Court finds it has subject-matter jurisdiction because the parties are otherwise diverse (Docs. 88, 90).

Second, Blue Sand Capital must be dismissed. It is undisputed that Blue Sand Capital—a Delaware LLC—is dissolved and canceled.[3] As a result, it is not subject to suit unless first revived by a Delaware court. *See Capone v. Castleton Commodities Intern. LLC*, No. 651794/2015, 2016 WL 1222163, at *3 (N.Y. Sup. Ct. Mar. 29, 2016); *Corder v. Antero Res. Corp.*, 322 F. Supp. 3d 710, 716 (N.D.W. Va. 2018), *aff'd*, 57 F.4th 384 (4th Cir. 2023) ("Because an LLC cannot be sued after it dissolves and files a certificate of cancellation, [LLC defendant] cannot be named as a party in this action." (applying Delaware law)). This "revival" requires Plaintiffs to ask the Delaware Court of Chancery

---

[3] The Court is displeased with defense counsels' gamesmanship. In previous filings, the defense led both this Court and Plaintiffs to believe that Blue Sand Capital was an existing entity—even attempting to have this case dismissed because Blue Sand Capital needed to be joined believing such joinder would defeat diversity. (Doc. 36). Yet somehow, over a year into this case, it is only now coming to light that the Company is dissolved and cancelled.

to nullify the cancellation.  *Capone*, 2016 WL 1222163, at *3.  As far as the Court can tell, Plaintiffs have not done so or even attempted to do so.

Plaintiffs protest that Delaware law permits suit against a dissolved LLC if the dissolution was improper or done in bad faith.  Assuming this is true (their cited authority offers no support), it does not negate the prerequisite step of seeking nullification.  So the Court dismisses the claims against Blue Sand Capital and strikes all relief sought from Blue Sand Capital.[4]  *See id.* at *6 (determining the case "may not proceed unless and until" the cancelled LLCs are revived).

Third, and on a similar note, Defendants argue that this entire action must be dismissed because Blue Sand Capital no longer exists but is a "necessary" party.  Although Defendants never cite the rule, they refer to Federal Rule of Civil Procedure 19(a), which dictates when a party is "required."  But this argument warrants little attention because it stops short.

Defendants argue only that Blue Sand Capital is a required—or necessary—party.  But even assuming Defendants are correct, "it is not enough to dismiss a lawsuit merely because a party is a required (or necessary) party; the absent party must also be found, after an examination of the Rule 19(b)

---

[4] On a separate note, the relief sought from Blue Sand Capital seems impossible.  As previously noted, Horsman seeks reinstatement of his managerial rights, and Holdings seeks reinstatement of its membership interest in the Company.  But if the Company no longer exists, this relief appears unavailable, and Plaintiffs provide no argument to the contrary.

factors, to be indispensable to the pending litigation." *Santiago v. Honeywell Int'l, Inc.*, 768 F. App'x 1000, 1005 (11th Cir. 2019). Defendants never argue that Blue Sand Capital is an indispensable party under Rule 19(b), analyze the Rule 19(b) factors, or even cite the rule. Regardless, dismissal of the entire action seems unnecessary. The Court already dismissed Blue Sand Capital and struck all relief sought from it. Otherwise, Plaintiffs seek monetary damages against Defendant Cooney and indemnification from Blue Sand Securities. Defendants have offered no reason why Blue Sand Capital's presence is needed for such claims. So the Court continues on.

The fourth issue that must be addressed is the new claims Plaintiffs brought without Court approval. When the Court dismissed Plaintiffs' amended complaint, it granted them leave to amend. (Doc. 47). But this leave was solely to rectify the pleading deficiencies in the amended complaint, not to add new claims. *See Hooker v. Off. of Pers. Mgmt. & Dep't of Veteran Affs.*, No. 8:20-CV-1248-WFJ-CPT, 2021 WL 372827, at *3 (M.D. Fla. Feb. 3, 2021) ("The order dismissing the initial complaint with leave to amend does not grant leave to add totally new claims."). Nevertheless, when Plaintiffs filed their second-amended complaint, they unilaterally added claims for breach of an oral contract, indemnification, and declaratory judgment. (Doc. 50).[5]

---

[5] Plaintiffs subsequently filed the operative third-amended complaint, which included two newly added tortious interference claims. (Doc. 74). But the parties stipulated to this

More problematic though is the timing of these new claims. The deadline to amend pleadings was April 29, 2024. (Doc. 25). Plaintiffs filed their second-amended complaint on October 3, 2024, well after the deadline. Even if Plaintiffs had sought leave to add the new claims, they would have had to satisfy Rule 16's good-cause standard. *See Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998). This standard is not satisfied when Plaintiffs knew the facts of the underlying proposed amendment before the deadline. *See Allstate Ins. Co. v. Regions Bank*, No. CIV.A. 14-0067-WS-C, 2014 WL 4162264, at *4 n.6 (S.D. Ala. Aug. 19, 2014) (collecting cases). Such is the case here.

Plaintiffs base each additional claim on the same underlying conduct from the original complaint—Cooney's wrongful repurchasing of Holdings' membership interest. Moreover, their breach of oral contract claim is based on a purported oral contract executed in July 2020. As alleged, this oral contract between the Cooneys and Horsman supplemented the Blue Sand operating agreements by prohibiting involuntary redemptions, involuntary expulsions, and involuntary removals of a party's membership interests in the companies. (Doc. 74 ¶ 44). Surely, Plaintiffs knew of this oral agreement essential to their entire case, entered over two years before this lawsuit, before the deadline to amend pleadings. Similarly, Plaintiffs' indemnification claim arises from an

---

amendment (Doc. 67), Plaintiffs sought leave to add them (Doc. 73), and given Defendants' stipulation, the Court rubber-stamped it (Doc. 75). So *these* claims are permitted.

indemnification provision in the 2020 Amended Blue Sand Securities Operating Agreement. (*Id.* ¶ 299). Given that the parties executed this Agreement in July 2020 and it was attached to the original complaint, Plaintiffs knew of this provision before filing this suit and the deadline to amend pleadings.

That's not all. Plaintiffs also added entirely new grounds for their breach of contract claim. In the amended complaint, Plaintiffs explicitly limited the breach of contract claim to breach of the Blue Sand Capital Operating Agreement. (Doc. 29 ¶¶ 117–26). The Court even observed this limitation in its prior Order dismissing the amended complaint. (Doc. 47 at 7–8 n.8). But now, Plaintiffs allege that Cooney also breached several provisions of the 2020 Amended Blue Sand Securities Operating Agreement. (Doc. 74 ¶¶ 215–18). Again, Plaintiffs knew of this agreement and the alleged breaches well before the deadline to amend the pleadings.

In short, Plaintiffs tried to surreptitiously add several new claims without leave of Court, beyond the deadline to amend pleadings, and without good cause. So Plaintiffs' breach of oral contract (count III), indemnification (count VIII), and declaratory judgment (count IX) claims are dismissed,[6] as are

---

[6] Because counts VIII (indemnification) and IX (declaratory judgment) are the only claims brought against Blue Sand Securities, this defendant is dismissed. Likewise, count IX is the only claim against Blue Sand Capital. So even if it existed, it would still be dismissed.

Plaintiffs' claims that Cooney breached the 2020 Amended Blue Sand Securities Operating Agreement contained in count I. *See Hooker*, 2021 WL 372827, at *3; *cf. Phillipeaux v. Miami Apartments Invs., LLC*, No. 23-CV-21275, 2023 WL 5720628, at *6 (S.D. Fla. Sept. 5, 2023) (observing plaintiff did not seek leave to add new claims to the amended complaint after the order on motion to dismiss but nevertheless permitting the new claims because the amended complaint was filed *before* the deadline to amend pleadings).

Fifth, Defendants maintain that counts I through IV (breach of express, oral, and implied contracts, and breach of fiduciary duty) must be dismissed as brought by Horsman because he lacks standing. (Doc. 81 at 4). They argue that Horsman was neither a member nor an Economic Interest Owner in Blue Sand Capital, so he lacks standing to bring a claim for breach of the Blue Sand Capital Operating Agreement or fiduciary duty. In response, Horsman asserts that he was a manager of Blue Sand Capital and an intended third-party beneficiary of the Operating Agreement and thus enjoys standing to bring suit. (Doc. 85 at 2). Although neither party briefs the issue well, the Court agrees with Defendants.

"Article III's standing requirements apply to state-law claims brought in federal court." *Liberty Surplus Ins. Corp. v. Kaufman Lynn Constr., Inc.*, 130 F.4th 903, 908 (11th Cir. 2025) (citation omitted). "The standing inquiry focuses on whether the plaintiff is the proper party to bring the suit, although

that inquiry often turns on the nature and source of the claim asserted[.]" *Id.* (cleaned up and citation omitted). This determination requires looking to state substantive law. *See AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1360 (11th Cir. 2007) (looking to state contract law to determine whether a party had Article III standing to bring a claim under contract).

Horsman lacks standing to bring the contractual or fiduciary claims. "Under Delaware law, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions." *Askari v. Pharmacy Corp. of Am.*, No. CV 16-1123-RGA, 2018 WL 3768988, at *2 (D. Del. Aug. 8, 2018) (citation omitted).[7] Horsman is a signatory to the Operating Agreement in two capacities. (Doc. 74 at 118–19). One is in his capacity as a member of Holdings, so it is really Holdings' signature. The other signature is in his capacity as manager. But, in Defendants' view, this managerial signature is moot because Horsman resigned from this role.

To establish Horsman's resignation, Defendants attached to their motion to dismiss Horsman's October 8, 2020, resignation letter. (Doc. 82 at 5). The

---

[7] The Blue Sand Capital Operating Agreement contains a choice-of-law provision that requires application of Delaware law. (Doc. 74 at 116). Because this is a diversity case, the Court applies Florida's conflict of law rules on enforceability of the choice-of-law provision. *Russo v. Fifth Third Bank*, 634 F. App'x 774, 776–77 (11th Cir. 2015). Florida enforces such provisions unless the chosen forum state's law contravenes strong public policy. *Id.* at 776. Here, there is no reason not to enforce Delaware contract law, so the Court does so.

letter, addressed to Cooney and signed by Horsman, reads in pertinent part: "[P]lease accept this letter as my resignation as a registered representative of Blue Sand Securities LLC and as a Manager of Blue Sand Capital LLC effective immediately[.]" (*Id.*). Horsman does not dispute this letter's authenticity. Instead, he argues that the third-amended complaint "alleges that Horsman was never properly removed as a manager," so a disputed fact exists as to whether he in fact resigned. (Doc. 85 at 8). But the allegations in the third-amended complaint are not accepted as true when a defendant makes a factual attack on standing. *See In re Fortra File Transfer Software Data Sec. Breach Litig.*, 749 F. Supp. 3d 1240, 1256 (S.D. Fla. 2024) (when weighing a factual attack to standing, "a court is free to consider materials outside the pleadings, and the pleadings are afforded no presumptive truth"). Given that Horsman does not dispute the letter's authenticity and that the letter contradicts the allegations in the third-amended complaint, the letter governs.

Alternatively, Horsman maintains that even if he did resign, "this would not terminate his rights under the [Operating Agreement], which requires specific procedures for removing managers that were not followed." (Doc. 85 at 8). He does not point to these removal procedures, and the Court thinks it knows why. Section 5.9 of the Operating Agreement unambiguously states, "Any Manager of the Company may resign at any time by giving prior written notice to the Members. The resignation of any Manager shall take effect upon

the date of the notice thereof . . . and . . . the acceptance of such resignation shall not be necessary to make it effective." (Doc. 74 at 16).  Horsman followed the resignation procedures to a tee.  Thus, Horsman was not a manager when the underlying actions giving rise to this case unfolded in 2021.

As for Horsman's claim that he is an intended third-party beneficiary, he offers no support for this assertion.  To demonstrate that he is a third-party beneficiary of the Operating Agreement, he needed to plead facts permitting a reasonable inference that: (i) the contracting parties intended that he benefit from the contract, (ii) the benefit was intended as a gift or in satisfaction of a pre-existing obligation to him, and (iii) the intent to benefit him was a material part of the parties' purpose in entering into the contract.  *Martinez v. GPB Cap. Holdings, LLC*, No. CV 2019-1005-SG, 2020 WL 3054001, at *6 (Del. Ch. June 9, 2020).  He makes no such allegations in the third-amended complaint or provides any such argument in the response.  Since Horsman was not a manager, a member, or an Economic Interest Owner, and he has not alleged he is a third-party beneficiary, he had no role in Blue Sand Capital or its operation during the relevant period and enjoyed no rights under the Operating Agreement.  The Court thus fails to see how he has standing to bring

his claims under the Blue Sand Capital Operating Agreement or assert that Cooney owed him a fiduciary duty.[8]

The final preliminary issue to address is the Operating Agreement's exculpatory clause. Section 5.4 of the Operating Agreement provides:

> The Managers shall perform the managerial duties hereunder in good faith[.] . . . The Managers shall not be liable to the Company or to any member or Economic Interest Owner . . . for any loss or damage sustained by the Company or any member or Economic Interest Owner, unless the loss or damage has been the result of fraud, deceit, gross negligence, willful misconduct, or a wrongful taking by the Managers.

(Doc. 74 at 94). Citing this provision, Cooney argues that Plaintiffs' claims against him must be dismissed. (Doc. 81 § 9). In response, Plaintiffs argue this provision is inapplicable because the third-amended complaint "contains specific allegations of self-dealing, manipulating corporate governance, misappropriating funds, and intentionally excluding Plaintiffs from management decisions." (Doc. 85 at 9). The Court finds that Plaintiffs have alleged enough to survive the motion to dismiss—but barely. Although factual allegations demonstrating Cooney engaged in fraud or willful misconduct are scarce, Plaintiffs' entire case turns on their belief that Cooney wrongfully redeemed Holdings' membership interest. If true, this could arguably amount to a "wrongful taking" under the exculpatory clause, which would expose

---

[8] In Plaintiffs' amended complaint, only Holdings brought the contract and fiduciary claims—Horsman only brought the unjust enrichment claim. (Doc. 29). Yet, as discussed above, they never sought leave to bring these claims on behalf of Horsman. So these claims could also be dismissed as to Horsman on this ground.

Cooney (in his managerial capacity) to liability. So the exculpatory provision
is inapplicable at this stage.

With all housekeeping accounted for, the Court turns to the merits of the
remaining claims. Here's what is left: breach of contract (count I), breach of
the implied covenant of good faith and fair dealing (count II), breach of
fiduciary duty (count IV), tortious interference (counts V and VI), and unjust
enrichment (count VII). Cooney is the only defendant remaining. He argues
that Plaintiffs fail to state a claim against him.

To survive a Federal Rule of Civil Procedure 12(b)(6) motion, a complaint
must allege "sufficient factual matter, accepted as true, to state a claim to relief
that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Bare
"labels and conclusions, and a formulaic recitation of the elements of a cause
of action," do not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).
A district court should dismiss a claim when a party does not plead facts that
make the claim facially plausible. *See id.* at 570. A claim is facially plausible
when a court can draw a reasonable inference, based on the facts pled, that the
opposing party is liable for the alleged misconduct. *See Iqbal*, 556 U.S. at 678.
This plausibility standard requires "more than a sheer possibility that a
defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 557
(internal quotation marks omitted)).

### *Breach of Contract (count I)*

The Court begins by unpacking Holdings' breach of contract claim. Although it cites various provisions in the Operating Agreement that it believes Cooney breached, the Court need not parse each provision. Instead, the Court addresses only two.

First is one of the overarching issues. To redeem Holdings' membership interest, Cooney amended the Operating Agreement to include section 10.6, which permitted the Company to repurchase a member's interest. Holdings argues that Cooney breached section 13.4 of the Operating Agreement, which states: "This Operating Agreement may not be amended except by the written consent of the Members by Majority Interest." (Doc. 74 at 117). In Holdings' view, Cooney breached this section by "amending, or purporting to amend, the Operating Agreement without the required written consent." (*Id.* ¶¶ 212–13). And because of this breach, it was deprived of its membership rights resulting in lost net profits and distributions. (*Id.* ¶ 220). Holdings states a plausible breach of contract claim.

Cooney's motion to dismiss asks the Court to do something it cannot: look beyond the pleadings. Attached to the motion is the written consent, signed by the Cooney brothers (who held a majority interest), amending the Operating Agreement to add section 10.6. (Doc. 82 at 7–13). If considered, this would doom Holdings' claim, showing Cooney had the appropriate consent to amend

the Operating Agreement. But the Court can only consider this document if it is central to Holdings' claim and undisputed. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). In determining whether a document is central to a plaintiff's claim, the court asks "whether the plaintiff would have to offer the document to prove its case." *Lockwood v. Beasley*, 211 F. App'x 873, 877 (11th Cir. 2006). Holdings need not offer the written consent to prove its case. Rather, Cooney needs it to prove his defense. So the Court cannot consider it. *See GoPlus Corp. v. Crown Equip. Corp.*, 533 F. Supp. 3d 1344, 1354 (S.D. Ga. 2021) ("[T]he centrality analysis focuses on [plaintiff's] claims and not [defendant's] affirmative defenses."). So this claim survives for now.

One more provision for now. Holdings cites section 5.1 of the Operating Agreement, which requires the *affirmative vote* of the managers by Manager Majority to approve or consent to any material company business not in the ordinary course of business. (Doc. 74 at 90). In Holdings' view, Cooney breached this provision by taking actions concerning Holdings' distributions, ownership, and other rights—*i.e.*, the repurchasing—which were material and outside the course of ordinary business, without an affirmative vote. (*Id.* ¶¶ 190–91). Holdings also states a claim here.

Cooney offers only one unpersuasive argument in opposition. He believes he did not need an affirmative vote to repurchase the membership interest because section 5.1 requires the affirmative vote of the "Manager(s) by

18

Manager Majority." Well, Manager Majority is defined as "approval *or consent*" of the managers holding a majority of outstanding membership shares. (Doc. 74 at 83) (emphasis added). And because the Cooneys—who held seventy percent of the outstanding membership—provided written *consent* for the repurchasing (which he also attaches to the motion to dismiss), an affirmative vote was not required.

Even assuming the Court could consider the written consent (it can't), Cooney's reading of the Operating Agreement is a nonstarter. Adopting Cooney's interpretation of section 5.1 requires ignoring the term "affirmative vote" in section 5.1. Doing so would render the term "affirmative vote" superfluous. The Court cannot apply such an interpretation. *See Salama v. Simon*, 328 A.3d 356, 378 (Del. Ch. 2024) ("[A] court will strive to give meaning to every term in a statute or contract, rather than rendering terms superfluous."). So it seems an affirmative vote was required to repurchase Holdings' membership interest. According to Holdings, no vote was held. Taken as true, and with no other argument from Cooney, Holdings has stated a claim for breach of the Operating Agreement.[9]

---

[9] At the very least, there are two reasonable interpretations to section 5.1. But at the motion-to-dismiss stage, the Court "will not choose between two differing reasonable interpretations of ambiguous provisions." *Talkdesk, Inc. v. DM Trans, LLC*, No. N23C-08-005 MAA CCLD, 2024 WL 2799307, at *4 (Del. Super. Ct. May 31, 2024).

As mentioned above, Holdings alleges Cooney breached an array of provisions in the Operating Agreement. These provisions largely address Holdings' right to access certain documents, Cooney's failure to properly distribute net profits, and Cooney's failure to comply with notice requirements for certain events, such as material decisions and votes. But given Holdings states a breach of contract claim, the Court need not parse through each provision one-by-one—especially since Cooney did not do so in his motion to dismiss. So for now, the breach of contract claim in count I survives.

### *Implied Covenant of Good Faith and Fair Dealing (count II)*

The Court shifts to Holdings' implied covenant claim. The implied covenant of good faith and fair dealing applies to implicit obligations to a contract outside the contract's express terms. *See Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 458 (Del. Ch. 2023). To prevail, "a plaintiff must prove a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Id.* Pertinent here, "[b]ecause the implied covenant is, by definition, implied, and because it protects the spirit of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Id.* (citations omitted). "Applying the implied covenant is a cautious enterprise where the Court infers contractual terms to span gaps in a contract that the moving party pleads were not anticipated by either party." *Kyle v.*

*Apollomax, LLC*, 987 F. Supp. 2d 519, 527 (D. Del. 2013) (citation and
quotations omitted). Holdings' claim fails to satisfy this standard.

Holdings' claim is duplicative of its breach of contract claim. It argues
that Cooney breached the implied covenant in five ways: by manipulating the
redemption process, by improperly altering profit distributions, by withholding
corporate records, by purporting to amend the Operating Agreement without
consent, and by failing to provide notice of material decisions. (Doc. 74 ¶ 227).
Although Holdings tries its best to craft purported gaps in the Operating
Agreement, these allegations are the same as those supporting its breach of
contract claim and are governed by express contractual terms. So count II is
dismissed. *See Buck v. Viking Holding Mgmt. Co. LLC*, No. CV N20C-08-249
AML (CCLD), 2021 WL 673459, at *5 (Del. Super. Ct. Feb. 22, 2021)
(dismissing the plaintiff's implied covenant claim because it "merely
repackages his breach of contract claim").

### *Breach of Fiduciary Duty (count IV)*

Next up is Holdings' breach of fiduciary duty claim. It alleges that
Cooney violated his fiduciary duties of loyalty and care by: (1) repurchasing its
membership interest in a way that unfairly advantaged himself and his
brother (self-dealing); (2) usurping business opportunities that belonged to
Blue Sand Capital and its members; (3) excluding Horsman from key
management decisions and depriving him of his right to participate in the

governance of the Company; and (4) wrongfully reducing Holdings'
membership interest by improperly amending the Operating Agreement
without the proper consent, vote, or notice.  (Doc. 74 ¶ 244).

Cooney argues that this claim overlaps with Holdings' breach of contract
claim and should be dismissed as duplicative.  When evaluating whether a
breach of fiduciary duty claim is duplicative of a breach of contract claim, "the
principal inquiry by Delaware courts is whether the fiduciary duty in the
complaint arises from general fiduciary principles or from specific contractual
obligations agreed upon by the parties."  *Grunstein v. Silva*, No. CIV.A. 3932-
VCN, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009).  Because of the "primacy"
of contract law over fiduciary law, a breach of fiduciary duty claim will
generally survive only when it can survive independently of the breach of
contract claim.  *Id.*

Holdings fails to state a breach of fiduciary duty claim.  It asserts that
Cooney usurped business opportunities that belonged to Blue Sand Capital
and its members without alleging any facts to support this claim, such as what
business opportunities Cooney purportedly usurped.  The allegation that
Cooney excluded Horsman from his managerial duties is also baseless because,
as discussed above, Horsman was not a manager (given he voluntarily resigned
from this role).  And the assertion that Cooney wrongfully reduced Holdings'
membership interest by improperly amending the Operating Agreement

without proper consent or notice also fails because it is duplicative of the breach of contract claim.

The self-dealing claim also fails. Holdings alleges that Cooney used his authority as a manager of the Company to direct distributions and manage company resources to unfairly benefit himself and his brother while excluding Holdings from the profits to which it was entitled (*i.e.*, the repurchasing of Holdings' membership interest). (Doc. 74 ¶ 244(A)). But Holdings offers only conclusory statements, like the one just mentioned, and buzzwords, such as self-interest, unfair, and misappropriation. It alleges no facts to suggest repurchasing its membership interest was unfair or that Cooney acted in his own self-interest. This is insufficient. *See Capella Holdings, Inc. v. Anderson*, No. CV 9809-VCN, 2015 WL 4238080, at *6 (Del. Ch. July 8, 2015) (dismissing breach of fiduciary claim where the plaintiff failed to provide "well-pleaded allegations about the unfairness of the transaction"); *Solomon v. Pathe Commc'ns Corp.*, No. CIV. A. 12563, 1995 WL 250374, at *6 (Del. Ch. Apr. 21, 1995) ("[P]laintiff has simply alleged that the transaction was a self-dealing one and, in conclusory fashion, that it was ill-informed, coercive, grossly unfair, etc. This is insufficient to state a claim.").

To the extent that Holdings believes Cooney's self-dealing was unfair because he used improper methods to repurchase its membership interest (*i.e.*, amending the Operating Agreement without consent), this is duplicative of the

breach of contract claim. *See Madison Realty Partners 7, LLC v. Ag ISA, LLC*, No. CIV.A. 18094, 2001 WL 406268, at *6 (Del. Ch. Apr. 17, 2001) (dismissing fiduciary claim where "the contract and fiduciary claims overlap completely since they are based on the same underlying conduct"). So Holdings fails to state a breach of fiduciary duty claim, and count IV is dismissed.

### *Tortious Interference (counts V and VI)*

Plaintiffs argue Cooney tortiously interfered with their contractual and business relationship with Blue Sand Capital by (1) unilaterally amending the operating agreement to permit the involuntary redemption of membership interests without Holdings' consent; (2) repurchasing the membership interest for a mere $15,000; (3) failing to provide profits and distributions owed to Plaintiffs under the Operating Agreement; and (4) dissolving and filing a certificate of cancellation of Blue Sand Capital to prevent enforcement of Plaintiffs' contractual rights. (Doc. 74 ¶¶ 259, 277). Plaintiffs fail to state a tortious interference claim.

"The elements of tortious interference with a contract or business relationship are: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Essex Cap. Grp., Inc. v. Warnell*,

No. 8:24-CV-0529-KKM-LSG, 2024 WL 4956731, at *3 (M.D. Fla. Dec. 3, 2024).[10]   A tortious interference claim can be maintained only when the defendant is a stranger to the contract or business relationship. *Id.* ("For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship.").   This is because non-strangers generally have a "privilege to interfere" with the contract or business relationship to protect their own economic interests. *Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1312, 1320 (S.D. Fla. 2014).  There is an exception to this privilege, however, when "malice is the *sole* basis for the interference— that is, when the defendant is interfering solely out of spite, to do harm, or for some other bad motive." *Warnell*, 2024 WL 4956731, at *3 (citation omitted and emphasis original).

Cooney argues that he is not a stranger to the Operating Agreement or the business relationship. Of course, he is correct. In response, Plaintiffs insist the exception applies, citing allegations in the third-amended complaint that Cooney "acted in bad faith" and engaged in the tortious conduct "with malice,

---

[10] Because these claims sound in tort rather than contract, the narrow choice-of-law provision in the Operating Agreement is inapplicable. *See Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003) ("Because the choice-of-law provision is narrow and governs only the scope and effect of the release, we turn to the choice-of-law rules of the forum state, Florida, to determine the applicable law governing the Plaintiffs' tort claims.").   Florida applies the "most significant relationship test." *Id.*  Applying this test, Defendants argue Florida law applies.  (Doc. 81 at 20 n.16).  The Court agrees with Defendants, and Plaintiffs do not address this point.  So the Court applies Florida law to the tort claims.

spite, ill-will, or the intent to harm Plaintiffs." (Doc. 74 ¶¶ 254, 261, 263, 272,
281). But, for the most part, they allege no facts to support these assertions.[11]
Simply regurgitating the buzzwords is insufficient. *See Duty Free Ams, Inc. v.
Estee Lauder Cos, Inc.*, 797 F.3d 1248, 1281 (11th Cir. 2015) (affirming
dismissal of tortious interference claim for failing to support it with facts).
Although they cite facts to support the underlying interference, none are
provided for the Court to plausibly infer malice or bad faith that would
overcome the stranger doctrine.

Plaintiffs also fail to establish the damages element of a tortious
interference claim. They allege that because of Cooney's tortious interference,
they have suffered "loss of business opportunities with clients, investors, and
industry partners, loss of goodwill associated with Plaintiffs' contributions to
[Blue Sand Securities] and [Blue Sand Capital], and financial harm arising
from [Cooney's] disruption of Plaintiffs' business relationships." (Doc. 74 ¶¶
265, 283). However, they allege no facts to support these purported damages,
such as what business opportunities or relationships were lost or what
financial harm they suffered. To the extent that the "financial harm" suffered
is the loss of net profits and distributions, this is duplicative of the breach of

---

[11] Plaintiffs allege that Cooney dissolved and cancelled the Company while they were
"actively disputing the purported wrongful redemption of [Holdings'] 30% membership
interest" to prevent them from enforcing their rights under the contract. (Doc. 74 ¶¶ 176–
81, 261, 279). This is likely enough to overcome the stranger doctrine solely for this
allegation. But, as discussed below, these claims are dismissed on another ground anyway.

contract claim. *See Aanonsen v. Suarez*, 306 So. 3d 294, 295 (Fla. Dist. Ct. App.
2020) (finding the plaintiff "failed to adequately allege and prove both a tort
independent from the acts that breached the contract and non-duplicative
damages grounded in tort"); *Island Travel & Tours, Co. v. MYR Indep., Inc.*,
300 So. 3d 1236, 1240 n.7 (Fla. Dist. Ct. App. 2020) (observing the plaintiff's
tort claim "is clearly duplicative of its breach of contract claim" because it
"sought the exact same damages for both" claims). Accordingly, Plaintiffs'
tortious interference claims (counts V and VI) are dismissed.[12]

### *Unjust Enrichment* (count VII)

As an alternative to counts I, II, and III, Plaintiffs bring an unjust
enrichment claim against Cooney. The elements of unjust enrichment are: (1)
an enrichment; (2) an impoverishment; (3) a relation between the enrichment
and impoverishment; (4) the absence of justification; and (5) the absence of a
remedy provided by law. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).[13]
Plaintiffs allege that Cooney was enriched by unjustifiably retaining their
contributions, including their rightful share of Blue Sand Capital's net profits,

---

[12] The Court doubts Horsman has standing to bring these claims anyway. *See KMS Rest.
Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1324 (11th Cir. 2004) (individual lacked standing
to bring tortious interference claim because he had no rights under the agreement).

[13] Because an unjust enrichment claim is "quasi-contract," the Operating Agreement's choice-
of-law provision applies to this claim as well. *See Jaris Lending, LLC v. Morgan*, No. 8:23-
CV-1181-CEH-SPF, 2024 WL 454422, at *3 (M.D. Fla. Jan. 12, 2024) (evaluating unjust
enrichment claim under Virginia law under the contract's choice-of-law provision).

and his appropriation of financial benefits derived from their efforts.  (Doc. 74
¶¶ 288–91).  And as a result of this retention, they were impoverished by "loss
of income, distributions, and other financial benefits that should have been
conferred upon [them] as rightful contributors to the company's operation and
success" as well as "loss of managerial and operational authority[.]"  (*Id.* ¶ 289).

Plaintiffs' unjust-enrichment claim fails because the Blue Sand Capital
Operating Agreement governs its rights in this action.  "[I]n evaluating a
party's claim for an equitable remedy based on unjust enrichment, courts
inquire at the threshold as to whether a contract already governs the parties'
relationship."  *Capano v. Ecofibre Ltd.*, No. CV 2024-0164-MTZ, 2025 WL
419494, at *1 (Del. Ch. Feb. 5, 2025) (citations omitted).  "If a contract
comprehensively governs the relevant relationship between the parties, then
the contract must provide the measure of the plaintiff's rights, and any claim
of unjust enrichment will be denied."  *Id.*  Put another way, "a claim for unjust
enrichment is not available if there is a contract that governs the relationship
between parties that gives rise to the unjust enrichment claim."  *Id.*  That said,
an unjust enrichment claim can survive a motion to dismiss if the "factual basis
for the unjust enrichment claim is independent of the allegations supporting
the breach of contract claim."  *Id.* (citations omitted).

As this entire discussion has shown, the relationship between Plaintiffs
and Cooney is entirely governed by the Operating Agreement.  Indeed,

Plaintiffs allege Cooney's purported unjust enrichment impoverished them through loss of distributions and managerial authority. But the Operating Agreement confers them these very rights—section 8.2 (distributions) and Article V (rights and duties of managers). Because Plaintiffs have alleged an express contract that governs, their unjust enrichment claim fails. *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009) ("[W]hen the complaint alleges an express, enforceable contract that controls the parties' relationship[,] a claim for unjust enrichment will be dismissed." (cleaned up)); *MHS Cap. LLC v. Goggin*, No. CV 2017–0449–SG, 2018 WL 2149718, at \*13 (Del. Ch. May 10, 2018) (dismissing unjust enrichment claim because the plaintiff's rights were "governed entirely by the ECM operating agreement").

Arguably, the relationship between Horsman and Cooney is not governed by the Operating Agreement because, as discussed earlier, Horsman is no longer party to the Operating Agreement. At any rate, the Court sees no relationship between Cooney's purported enrichment and Horsman's impoverishment. Any distribution of net profits that Cooney retained would not have affected Horsman because he was not a member of Blue Sand Capital, so he was never entitled to such distributions. The loss of managerial and operational authority was his own doing, given that he had resigned from his managerial position. So Horsman fails to state a claim either way, and count VI is dismissed.

## CONCLUSION

Here is where the case stands. All claims brought by Horsman are dismissed because he either lacks standing or fails to state a claim. Blue Sand Capital and Blue Sand Securities are also dismissed, leaving Holdings and Cooney as the remaining parties. Count I survives, but counts II through IX are dismissed.

The lingering issue is whether the Court should permit Plaintiffs amendment. We are almost a year and a half into this case. The deadline to amend pleadings expired a year ago, and the discovery cutoff is April 25—less than a month away. (Docs. 25, 70). The Court has already advised Plaintiffs of many of the existing pleading deficiencies in its previous Order dismissing the amended complaint. And this is Plaintiffs' third-amended complaint. After four bites at the apple, there is no reason to believe that a fourth-amended complaint would yield a different result, so leave to amend is not permitted. This case will proceed only on Holdings' breach of contract claim against Cooney.

Accordingly, it is now

**ORDERED:**

Defendants' motion to dismiss (Doc. 81) is **GRANTED in part and DENIED in part.**

1. Counts II through IX are **DISMISSED**.

2.  All clams brought by Plaintiff Patrick Horsman are **DISMISSED**.

3.  Defendants Blue Sand Capital, LLC and Blue Sand Securities, LLC

    are **DISMISSED**.

**DONE** and **ORDERED** in Fort Myers, Florida on April 8, 2025.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record